**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD LYNN WELKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:11CV00053 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE** | ) | |
| **Commissi oner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Donald Lynn Welker for Disability Insurance Benefits under Title II of the Social Security Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 17).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 18).  Plaintiff has filed a Reply Brief.  (Doc. No. 19).

**Procedural History**

On January 3, 2008, plaintiff filed an application for Disability Insurance Benefits, claiming that he became unable to work due to his disabling condition on September 7, 2007.  (Tr. 189-91).  This claim was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 23, 2010.  (Tr. 12, 12-22).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals

Council of the Social Security Administration (SSA), which was denied on February 15, 2011.

(Tr. 7, 1-6).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u>

20 C.F.R. §§ 404.981, 416.1481.

<u>**Evidence Before the ALJ**</u>

A.    <u>**Original ALJ Hearing**</u>

      Plaintiff's administrative hearing was held on August 17, 2009.  (Tr. 29).  Plaintiff was

present and was represented by counsel.  (<u>Id.</u>).  Vocational expert Brenda Young was also

present.  (<u>Id.</u>).

      Plaintiff stated that he was forty-six years of age, was five-feet ten-inches tall, and

weighed 209 pounds.  (Tr. 32).  Plaintiff testified that he was married, and had three children who

were aged twenty, eighteen, and fourteen.  (<u>Id.</u>).  Plaintiff stated that he lived in a split-level home

with his wife and children.  (<u>Id.</u>).  Plaintiff testified that he had to climb steps to get in his home.

(Tr. 33).

      Plaintiff stated that he drove occasionally, but did not drive when he was taking pain

medication.  (<u>Id.</u>).  Plaintiff testified that his wife drove him to the hearing.  (<u>Id.</u>).  Plaintiff stated

that he last drove the day prior to the hearing.  (<u>Id.</u>).  Plaintiff testified that he drove an average of

ten miles a week.  (<u>Id.</u>).

      Plaintiff stated that his wife's income as a secretary was the household's sole income

source.  (<u>Id.</u>).  Plaintiff testified that his children received Medicaid benefits, and that he had

private medical insurance.  (Tr. 34).

      Plaintiff stated that he had a high school diploma, and did not receive any vocational

training.  (<u>Id.</u>).  Plaintiff testified that he was able to read and write.  (Tr. 35).

- 2 -

Plaintiff stated that he was not working at the time of the hearing.  (Id.).  Plaintiff testified that he last worked in 2007, as a self-employed construction worker and carpenter.  (Id.).  Plaintiff stated that this was heavy work, and that he lifted up to 200 pounds at the position.  (Id.).  Plaintiff testified that, as a carpenter, he built houses and performed remodel work.  (Tr. 36).

Plaintiff stated that he alleged September 7, 2007, as his onset of disability date because this was the last day he worked before undergoing back surgery.  (Id.).  Plaintiff testified that he underwent a spinal fusion between L4[1] and L5 on September 10, 2007.  (Id.).  Plaintiff stated that he underwent a laminectomy[2] of L5 and S1 on September 26, 2007.  (Id.).  Plaintiff testified that the second surgery was not planned, and was necessary to relieve excruciating pain caused by the first surgery.  (Id.).  Plaintiff stated that he was hospitalized between the two surgeries to manage his pain.  (Id.).

Plaintiff testified that the second surgery relieved the stabbing pain in his legs, but did not relieve all of his pain.  (Tr. 37).  Plaintiff stated that he underwent tests after the second surgery, which revealed a tumor in his chest.  (Id.).  Plaintiff testified that he underwent another surgery on March 3, 2008.  (Tr. 38).

Plaintiff stated that, at the time of the hearing, he still experienced "terrible pain" in his hips and buttocks, and down into his legs.  (Id.).  Plaintiff testified that his chest issues had

---

[1]In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[2]Excision of a vertebral lamina.  Stedman's Medical Dictionary, 1046 (28th Ed. 2006).

resolved, although he never experienced symptoms from the tumor.  (Id.).

Plaintiff stated that he has attempted unsuccessfully to perform light work since September 7, 2007.  (Id.).  Plaintiff testified that he rode on a tractor for fifteen minutes and developed a stabbing pain in his right side.  (Id.).

Plaintiff stated that he performed construction and carpentry work since he was eighteen years old.  (Tr. 39).  Plaintiff testified that his father was a carpenter and taught plaintiff his trade.  (Id.).

Plaintiff stated that, on a typical day, he wakes up between 2:00 a.m. and 6:00 a.m., depending on whether he is able to sleep.  (Id.).  Plaintiff testified that he sits in his recliner when he wakes up, and then eats breakfast.  (Id.).  Plaintiff stated that, after he eats breakfast, he occasionally walks around outside.  (Id.).  Plaintiff stated that he cooks occasionally, but his wife cooks most meals.  (Tr. 40).  Plaintiff testified that he does "a little bit" of laundry, has difficulty washing dishes due to the stooping involved, and does not vacuum, mop, sweep, or shop for groceries.  (Id.).

Plaintiff stated that he still had a shop and tools.  (Tr. 40-41).  Plaintiff testified that he was not building anything at the time of the hearing.  (Tr. 41).  Plaintiff testified that he has not worked with his tools since his alleged onset of disability date, although he did cut some blocks of wood with his chainsaw in the winter of 2007.  (Id.).

Plaintiff stated that he considered himself to be a sociable person, and that he talked to friends on the telephone.  (Id.).  Plaintiff testified that he was not active in any clubs or organizations, although he did attend Church.  (Id.).

Plaintiff stated that he watched television frequently.  (Id.).  Plaintiff testified that he read

occasionally.  (Tr. 42).

Plaintiff stated that he generally lies down to rest in the afternoon, and then sits in his recliner.  (Id.).  Plaintiff testified that he has gone out to eat on special occasions.  (Id.).  Plaintiff stated that he tries to attend church on Sundays.  (Id.).

Plaintiff testified that he did not do any yard work.  (Id.).  Plaintiff stated that he attempted unsuccessfully to push mow his lawn on one occasion.  (Tr. 43).

Plaintiff testified that he had no hobbies.  (Id.).  Plaintiff stated that he did not engage in any outdoor activities such as fishing or camping  (Id.).

Plaintiff testified that he was able to walk one-sixteenth of a mile.  (Id.).  Plaintiff stated that he had no difficulty showering or bathing.  (Id.).

Plaintiff testified that he was taking Zyrtec[3] for allergies.  (Tr. 45).

Plaintiff stated that he took Norco[4] for pain.  (Id.).  Plaintiff testified that he experienced constant pain in his lower back and buttocks when he did not take his medication.  (Id.).  Plaintiff stated that his pain was a four on a scale of one to ten at the time of the hearing.  (Tr. 46).  Plaintiff testified that his pain was usually around a four.  (Id.).  Plaintiff stated that his pain level was brought down to a one or two when he takes the Norco.  (Id.).  Plaintiff testified that he also took over-the-counter Tylenol.  (Id.).

---

[3]Zyrtec is indicated for the treatment of allergies.  Physician's Desk Reference, ("PDR"), 1921 (63rd Ed. 2009).

[4]Norco is a narcotic pain reliever indicated for the relief of moderate to severe pain.  See WebMD, **http://www.webmd.com/drugs** (last visited August 7, 2012).

Plaintiff stated that he took Xanax[5] for anxiety.  (Tr. 47).  Plaintiff testified that he experienced panic attacks, and that the Xanax helped control them.  (Id.).

Plaintiff stated that he took Lexapro,[6] which is an antidepressant.  (Id.).  Plaintiff testified that he has experienced depression since October or November of 2007.  (Id.).

Plaintiff stated that he experienced no side effects from his medication.  (Id.).

Plaintiff testified that he was physically unable to work due to the pain he experiences.  (Id.).  Plaintiff stated that his physical therapist told him that his sacroiliac joint ("SI joint")[7] will not stay in place, and that lifting or bending causes it to come out of place.  (Id.).  Plaintiff testified that he experiences severe pain when the SI joint comes out of place.  (Tr. 48).  Plaintiff stated that he sees his physical therapist for an adjustment when his SI joint comes out of place.  (Id.).

Plaintiff testified that, due to his depression, he experienced difficulty sleeping and he thought about his inability to work.  (Tr. 49).  Plaintiff stated that he had never been in a mental hospital.  (Id.).  Plaintiff stated that he saw a psychiatrist every three months.  (Id.).  Plaintiff testified that he had never made an attempt on his life, although he had "thought about praying to die."  (Tr. 50).  Plaintiff stated that he has experienced hallucinations.  (Id.).  Plaintiff described an incident in which he saw a child in his stairway.  (Id.).  Plaintiff testified that he experienced

---

[5]Xanax is indicated for the treatment of anxiety and panic disorders.  See WebMD, **http://www.webmd.com/drugs** (last visited August 7, 2012).

[6]Lexapro is an antidepressant indicated for the treatment of major depressive disorder.  See PDR at 1175.

[7]The sacroiliac joint is the joint formed by the sacrum and ilium where they meet on either side of the lower back.  Stedman's at 1015.

difficulty concentrating because he was always thinking about his back surgery.  (Id.).

Plaintiff stated that he experienced difficulty sitting in a chair due to back pain.  (Tr. 51).
Plaintiff testified that he was able to stand for about fifteen minutes.  (Id.).  Plaintiff stated that he
was able to walk one-sixteenth of a mile.  (Id.).  Plaintiff testified that the back pain he
experienced when sitting was relieved temporarily when he stands, although he started to
experience pain from standing.  (Id.).  Plaintiff stated that he lies down to relieve his back pain.
(Id.).  Plaintiff testified that he was able to lift about fifteen pounds.  (Id.).  Plaintiff stated that he
experienced difficulty stooping, crouching, kneeling, crawling, and climbing steps.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that he was leaning forward in his
chair during the hearing to help ease the pain in his back and buttocks.  (Tr. 52).  Plaintiff stated
that the most comfortable position for him was sitting back in his recliner.  (Id.).  Plaintiff testified
that he typically sat in his recliner about six hours out of an eight-hour day.  (Id.).

Plaintiff stated that he recently underwent nerve conduction testing, which revealed
permanent nerve damage in his legs.  (Tr. 53).  Plaintiff testified that he saw a neurosurgeon, who
ordered additional testing.  (Id.).  Plaintiff stated that this additional testing had not yet been
scheduled at the time of the hearing.  (Id.).

Plaintiff testified that he has not enjoyed anything in life since his initial back surgery
performed by Dr. Scott Gibbs.  (Tr. 54).

Plaintiff stated that he had never received mental health treatment prior to his back
surgery.  (Id.).

Plaintiff's attorney next examined plaintiff's wife, Juanita Welker, who testified that she
had been married to plaintiff for twenty-five years.  (Tr. 55).  Ms. Welker stated that she had

- 7 -

observed changes in plaintiff's life since September of 2007.  (Id.).  Ms. Welker testified that she has had to help plaintiff deal with the disappointment of the surgery "not fixing him and actually taking his life away."  (Id.).  Ms. Welker stated that plaintiff sees a psychiatrist and takes medication to help him sleep.  (Tr. 56).  Ms. Welker testified that plaintiff struggles with severe depression.  (Id.).

The ALJ then questioned Ms. Welker, who testified that she cooks plaintiff breakfast in the morning before she leaves for work.  (Id.).  Ms. Welker stated that plaintiff sleeps frequently during the day due to the pain medication he takes.  (Id.).  Ms. Welker testified that plaintiff moves from the recliner to the basement, where he plays games on the computer.  (Tr. 56-57).  Ms. Welker stated that, on a "really good day," plaintiff might go to the garage and "tinker on something," although he cannot do this for long periods.  (Tr. 57).

Ms. Welker testified that plaintiff experiences pain after engaging in almost any activity.  (Id.).  Ms. Welker stated that it takes plaintiff two to three days to get over the pain he experiences after sitting in the car to drive to St. Louis.  (Id.).  Ms. Welker testified that, on a good day, plaintiff might wash dishes or do some laundry.  (Id.).  Ms. Welker stated that plaintiff enjoys fixing things, and that he "tinkers" with things.  (Id.).  Ms. Welker testified that plaintiff is able to repair items in the house if it does not require heavy lifting.  (Tr. 58).

Plaintiff's attorney then re-examined Ms. Welker, who testified that plaintiff tends to play computer games in the middle of the night when he is unable to sleep due to pain and discomfort.  (Tr. 59).  Ms. Welker stated that plaintiff "tinkers with" items, such as the carburetor, approximately every two to three weeks.  (Id.).  Ms. Welker testified that plaintiff is only able to work on items for short periods.  (Id.).  Ms. Welker stated that the work plaintiff does trying to

- 8 -

fix items is not consistent with the performance of a light or sit-down job because plaintiff has to lie down after working for short periods. (Id.).

Ms. Welker testified that plaintiff spends the majority of his day lying in bed. (Id.). Ms. Welker stated that plaintiff typically engages in activity for about thirty minutes, and then has to take a pain pill and lie down for two to three hours. (Tr. 60).

Ms. Welker stated that plaintiff was waiting for his neurosurgeon to schedule an MRI to determine if plaintiff was a surgical candidate. (Id.).

The ALJ then examined vocational expert Brenda Young, who testified that plaintiff's past work as a carpenter was classified as heavy and skilled. (Tr. 62).

The ALJ asked Ms. Young to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: capable of lifting, carrying, pushing, and pulling twenty pounds occasionally and ten pounds frequently; sitting for six hours out of an eight-hour workday; standing and walking for two hours out of an eight-hour workday; requires a sit/stand option; can occasionally climb, balance, stoop, crouch, kneel or crawl; should have no exposure to ladders, ropes scaffolds, moving machinery, unprotected heights, or concentrated exposure to vibration; and is limited to simple, repetitive tasks and instructions. (Tr. 62-63). Ms. Young testified that these limitations would eliminate plaintiff's past work. (Tr. 63). Ms. Young stated that the individual could perform other jobs, such as sedentary cashier (2,000 such positions in Missouri); and small products assembly (6,000 positions in the State). Ms. Young indicated that these positions were exhaustive. (Tr. 64).

Plaintiff's attorney then asked Ms. Young to assume that a hypothetical claimant required frequent rest breaks throughout the day due to chronic pain and side effects from medications

upwards of four to six hours unpredictably.  (Id.).  Ms. Young testified that such restrictions

would eliminate all work.  (Id.).

Ms. Young testified that she had been successful in placing individuals in positions with

sit/stand options where the individual has a sit/stand option every thirty minutes.  (Tr. 65).

The ALJ indicated that he was ordering a post-hearing psychiatric consultative

examination based on the record, and that he would hold the matter open until that was

completed.  (Id.).

**B.      Supplemental Hearing**

A supplemental hearing was held on February 8, 2010.  (Tr. 69).  Plaintiff was present and

was represented by counsel.  (Id.).

Plaintiff's attorney stated that plaintiff had undergone back surgery since the last hearing

and was scheduled to begin pain management with a pain management specialist, Dr. Sue Thor.

(Tr. 70).  Plaintiff's attorney stated that plaintiff continued to suffer from severe back pain and

depression and anxiety.  (Tr. 71).  Plaintiff's attorney indicated that plaintiff had undergone a

consultative psychiatric examination.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that he was unable to work because all

physical activity caused pain.  (Id.).  Plaintiff stated that he had to take medication and lie down

for hours at a time.  (Tr. 72).

Plaintiff testified that, due to his mental impairments, life was no longer enjoyable.  (Id.).

Plaintiff stated that he did not like being around people who were enjoying life.  (Id.).

Plaintiff testified that, during his last surgery, his doctor removed scar tissue that was

pushing against his spinal cord.  (Id.).  Plaintiff stated that this surgery relieved the numbness he

was experiencing in his legs, but had no effect on his pain.  (Id.).

Plaintiff testified that he experienced pain in both hips and down both legs.  (Id.).  Plaintiff stated that he experienced pain daily.  (Id.).  Plaintiff testified that walking, standing, and sitting caused the pain to increase.  (Tr. 73).  Plaintiff stated that his pain ranged from a two to an eight on a scale of one to ten.  (Id.).  Plaintiff testified that his pain was at a level eight after he stood in line for thirty minutes at a funeral home.  (Id.).

Plaintiff stated that he had not driven since his last surgery.  (Id.).  Plaintiff testified that his wife drove him to the hearing.  (Id.).  Plaintiff stated that he did some laundry.  (Id.).  Plaintiff testified that he was able to lift a whole basket of towels.  (Tr. 74).  Plaintiff stated that he was able to lift about ten pounds without having pain.  (Id.).

Plaintiff testified that he was taking medication for depression.  (Id.).  Plaintiff stated that he saw a psychiatrist every three months.  (Id.).  Plaintiff testified that the medication helped temporarily.  (Id.).  Plaintiff stated that he had good days and bad days with the depression.  (Id.).  Plaintiff testified that he had about four bad days a week, on which he was unable to do something he used to be able to do.  (Id.).  Plaintiff stated that his depression caused him to experience fatigue, and that he napped during the day.  (Tr. 75).

Plaintiff testified that he his friends visited him at his home about once a week.  (Id.).

Plaintiff testified that he did not read "things with sports and things where people are active and enjoying life because it makes [him] angry."  (Id.).  Plaintiff stated that he believed that dying would be a lot easier than living, but he would not take his life because of his wife and children.  (Id.).

Plaintiff testified that he has experienced hallucinations when he was taking "a bunch of

different medicines." (Id.).

Plaintiff stated that he had difficulty interacting with the general public because he became jealous and angry when people talked about plans for the future. (Tr. 76). Plaintiff testified that he was sometimes short with people. (Id.).

Plaintiff stated that he usually felt better after taking a pain pill and lying down for about two hours. (Id.).

The ALJ then examined plaintiff, who testified that Dr. Kishore Khot was his psychiatrist. (Tr. 77). Plaintiff stated that he saw Dr. Cote every three months, and that he last saw him in January of 2010. (Id.). The ALJ noted that Dr. Cote assessed a GAF[8] score of 60[9] in his medical source statement. (Id.).

Plaintiff testified that he was still taking Zyrtec, Norco, Tylenol, Xanax, and Lexapro. (Tr. 77-78). Plaintiff stated that he was also taking Neurontin[10] and Soma.[11] (Tr. 78).

Plaintiff testified that his pain increased when he stood for long periods, but his pain was "not too bad" when he was lying down. (Id.).

_____

[8]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[9]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[10]Neurontin is indicated for the treatment of seizures and nerve pain. See WebMD, **http://www.webmd.com/drugs** (last visited August 7, 2012).

[11]Soma is indicated for the treatment of acute, painful musculoskeletal conditions. See PDR at 1931.

Plaintiff stated that he regretted undergoing the first surgery, and that the surgeon talked him into the surgery. (Tr. 79). Plaintiff testified that the last surgery he underwent was successful in relieving the numbness in his legs, but it did not reduce his pain. (Id.).

Plaintiff stated that he occasionally did laundry, washed dishes, and cooked meals in the microwave. (Id.). Plaintiff testified that he did not make his bed, vacuum, mop, sweep, or shop with his wife. (Tr. 79-80). Plaintiff stated that he did small repairs around the house, and that he had done some small engine repair, but not recently. (Tr. 80).

Plaintiff testified that he had some difficulty concentrating. (Id.).

Plaintiff stated that he still considered himself a sociable person, and that he still had friends. (Id.). Plaintiff testified that he attended Church when he was physically able. (Id.).

Plaintiff stated that he was able to sit for fifteen to twenty minutes. (Tr. 81). Plaintiff testified that, when he was at home, he was usually either lying in bed or sitting back in the recliner. (Id.). Plaintiff stated that he was able to lift fifteen pounds or more, but it caused pain. (Id.). Plaintiff testified that he had difficulty with bending, stooping, crouching, kneeling, crawling, and climbing steps. (Id.).

## C.   Medical Records

The record reveals that Drs. William Ogle and Scott Gibbs performed an anterior interbody fusion at the L5-S1 disc space on September 10, 2007. (Tr. 286). Plaintiff's preoperative diagnosis was L5-S1 degenerative disc disease.[12] (Id.).

Plaintiff presented to Dr. Gibbs for his ten-day postoperative visit on September 20, 2007,

---

[12]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See Medical Information Systems for Lawyers, § 6:201.

- 13 -

at which time plaintiff reported a significant increase in his bilateral leg pain.  (Tr. 341).  Plaintiff indicated that his pain radiated posteriorly from his buttocks to his feet.  (Id.).  Plaintiff also reported numbness in the anterior thigh and posterior leg.  (Id.).  Dr. Gibbs admitted plaintiff for pain control and evaluation.  (Tr. 342).

On September 26, 2007, Dr. Gibbs performed a second stage procedure involving a posterior L5 decompressive laminectomy.  (Tr. 329, 343).  Plaintiff's preoperative diagnosis was lateral recess and foraminal stenosis.[13]  (Id.).  On his first postoperative visit on October 9, 2007, plaintiff reported that his pain had markedly improved.  (Tr. 343).  Plaintiff did have some residual aching in the right leg.  (Id.).  Plaintiff was wearing a bone growth stimulator and lumbar brace, and was taking Vicodin.[14]  (Id.).

Plaintiff presented to Dr. Gibbs on November 27, 2007, at which time plaintiff reported that he had only made minimal improvement since his last visit.  (Tr. 348).  Plaintiff denied any numbness and tingling in his feet bilaterally.  (Id.).  Plaintiff reported some low back discomfort with prolonged sitting.  (Id.).  Plaintiff indicated that his symptoms had caused him to develop some depressive feelings.  (Id.).  Dr. Gibbs prescribed Flexeril[15] for muscle spasms, Amitriptyline[16] for depressive symptoms, and continued plaintiff on Neurontin and Vicodin.  (Tr. 350).  Dr. Gibbs

---

[13]Narrowing of the spinal canal.  See Stedman's at 1832.

[14]Vicodin is an opioid analgesic indicated for the relief of moderate to moderately severe pain.  See PDR at 529.

[15]Flexeril is indicated for the treatment of muscle spasms.  See WebMD, **http://www.webmd.com/drugs** (last visited August 7, 2012).

[16]Amitriptyline is an antidepressant indicated for the treatment of depression and other mood disorders.  See WebMD, **http://www.webmd.com/drugs** (last visited August 7, 2012).

recommended that plaintiff continue with physical therapy and stretching exercises and remain active.  (Id.).  He also ordered a CT scan of the lumbar spine.  (Id.).

Plaintiff underwent a CT scan of the lumbar spine on November 27, 2007, which revealed mild degenerative facet changes at L4-5 with some minimal neural foraminal narrowing at this level; and more advanced degenerative facet changes at L5-S1, with at least moderate foraminal stenosis at this level.  (Tr. 300).

Plaintiff presented to Dr. Gibbs on December 14, 2007, at which time plaintiff complained of diffuse bilateral lower extremity "aching, burning, stinging and stabbing" in the lower extremities.  (Tr. 351).  Plaintiff also reported that he was depressed.  (Tr. 352).  Plaintiff's wife indicated that she removed firearms from the home due to concern for depressive symptoms.  (Id.).  Dr. Gibbs noted that plaintiff did not appear to have any current suicidal ideations.  (Id.).  Dr. Gibbs diagnosed plaintiff with lower extremity paresthesia[17] and depressed affect.  (Tr. 353).  Dr. Gibbs recommended further diagnostic testing, including EMG/nerve conduction studies of the lower extremities.  (Id.).  Dr. Gibbs referred plaintiff to Community Counseling Center.  (Id.).


Plaintiff presented to Annamaria R. Guidos, M.D., on December 14, 2007, for nerve conduction testing.  (Tr. 307-08).  Dr. Guidos diagnosed plaintiff with chronic L5 radiculopathy.[18] (Tr. 308).  Dr. Guidos also found that plaintiff's physical examination suggested trochanteric

---

[17]A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems.  Stedman's at 1424.

[18]Disorder of the spinal nerve roots.  Stedman's at 1622.

- 15 -

bursitis,[19] especially on the right side.  (Id.).  Dr. Guidos recommended x-rays of plaintiff's hips.  (Id.).

In a note dated December 20, 2007, Dr. Gibbs indicated that a recent radiology report of plaintiff's thoracic spine revealed a mass in plaintiff's chest.  (Tr. 355).  Dr. Gibbs noted that plaintiff would undergo a CT guided biopsy.  (Id.).

On December 24, 2007, Dr. Gibbs indicated that plaintiff had undergone a CT guided chest biopsy, and that the results were pending.  (Tr. 356).  Plaintiff complained of persistent chronic pain in his lower back and leg predominantly in his hips.  (Id.).  Upon examination, plaintiff's gait and station were normal, and plaintiff had some tenderness over his greater trochanter region bilaterally and a mild positive Patrick's exam[20] on the right.  (Tr. 357).  Dr. Gibbs indicated that plaintiff's EMG/nerve conduction study was unremarkable for any acute radiculopathy.  (Tr. 358).  Dr. Gibbs stated that plaintiff had been on Neurontin and a home trial of TENS unit,[21] and there had been some slow modest improvement.  (Id.).  He stated that there was some suspicion of bursitis in the hips.  (Id.).  Dr. Gibbs noted that follow-up imaging of the lumbar spine did not reveal any surgical lesion.  (Id.).  Dr. Gibbs stated that there was nothing further neurosurgically that he could offer plaintiff.  (Id.).  He recommended referral for hip injections.  (Id.).

Plaintiff saw Dr. Gibbs on January 3, 2008, at which time plaintiff reported that his

---

[19]Inflammation of the trochanteric bursa, which is part of the hip.  See Stedman's at 282.

[20]A test to determine the presence or absence of sacroiliac disease.  Stedman's at 1957-58.

[21]Transcutaneous electrical nerve stimulation (TENS) is a method of reducing pain by passage of an electric current.  Stedman's at 1838.

generalized lower extremity aching and fatigue type symptoms had all but resolved since starting

Amitriptyline.  (Tr. 425).  Plaintiff also indicated that he was sleeping much better.  (Id.).  Plaintiff

was using a TENS unit on his low back, and still had some intermittent paresthesias bilaterally.

(Id.).  It was noted that plaintiff's CT guided chest mass biopsy revealed findings consistent with a

benign peripheral nerve sheath tumor.  (Id.).  Upon physical examination, plaintiff had a normal

range of motion of the back in all cardinal directions of the spine, no focal tenderness to palpation

or evidence of spasm, and plaintiff's straight leg raising test was negative in the sitting position

bilaterally.  (Tr. 426).  Dr. Gibbs diagnosed plaintiff with left chess mass, possible benign

peripheral nerve sheath tumor; improving L5 neuropathy,[22] and trochanteric bursitis.  (Tr. 427).

It was noted that the surgical removal of the thoracic mass would be scheduled after it could be

coordinated with Dr. Ogle.  (Id.).  Dr. Gibbs stated that plaintiff was doing much better regarding

his back, and he would like to gradually advance his activities.  (Tr. 428).  Dr. Gibbs spoke to

plaintiff about advancing his activities to include his tractor and four-wheeler as well as lifting.

(Id.).  Dr. Gibbs also indicated that plaintiff's mood seemed much better since taking Elavil.[23]

(Id.).

Plaintiff presented to Dr. Gibbs on February 7, 2008, at which time plaintiff reported that

his low back and lower extremity symptoms had completely resolved.  (Tr. 422).  Plaintiff

reported that he had increased endurance and function, and was not taking any medications for

pain or muscle relaxation.  (Id.).  Plaintiff had undergone steroid injections to his hips by Dr.

_____

[22]A classic term for any disorder affecting any segment of the nervous system.  Stedman's
at 1312.

[23]Elavil is an antidepressant indicated for the treatment of depression and other mood
disorders.  See WebMD, **http://www.webmd.com/drugs** (last visited August 7, 2012).

Terry Cleaver, which had taken away the lingering hip pain as well.  (Id.).  Dr. Gibbs indicated that he would contact Dr. Ogle to develop a surgical plan regarding the resection of plaintiff's thoracic mass.  (Tr. 423).

Marshal Toll, Psy.D. completed a Psychiatric Review Technique on February 13, 2008. (Tr. 390-400).  Dr. Toll expressed the opinion that plaintiff's depression was non-severe and caused only mild difficulties in plaintiff's ability to maintain concentration, persistence, or pace. (Tr. 398).

Plaintiff saw Dr. Gibbs on March 14, 2008, at which time Dr. Gibbs indicated that plaintiff had undergone surgery on March 3, 2008, and was doing relatively well.  (Tr. 420).  Dr. Gibbs noted that plaintiff's biopsy revealed a benign peripheral nerve sheath tumor.  (Id.).

Plaintiff saw Dr. Gibbs on April 15, 2008, at which time plaintiff reported incisional pain at the left chest region, but denied low back or lower extremity symptoms.  (Tr. 417).  Dr. Gibbs recommended physical therapy, and encouraged plaintiff to continue weaning from the narcotic pain medication.  (Tr. 418).  On May 20, 2008, plaintiff had intermittent complaints of left chest wall pain, low back pain, and hip pain.  (Tr. 414).  Plaintiff expressed concern regarding his return to the workforce, and indicated that he was contemplating applying for a job in a small school system as a custodian.  (Id.).  Plaintiff reported that he had spent three or four hours picking up limbs in his yard nonstop the previous day, and complained of diffuse joint pain and stiffness in his low back.  (Id.).  Dr. Gibbs recommended that plaintiff complete physical therapy and transition to a home exercise program.  (Tr. 416).

On August 7, 2008, plaintiff reported that, in June, he was driving a tractor baling hay when he turned his torso looking backwards.  (Tr. 411).  Plaintiff stated that later that evening, he

- 18 -

experienced sharp severe pain in his thoracolumbar region radiating to the right side down into the right lower abdomen. (Id.). Plaintiff underwent testing to determine the source of the abdominal pain, which was unremarkable. (Id.). Plaintiff reported a very sharp, severe pain, with a radiating quality, which increased when he distributed his weight on the left side of his body. (Id.). Upon physical examination, plaintiff had some tenderness in the lower thoracic region around the thoracolumbar junction, right-sided rib care pain, and right lower quadrant discomfort. (Tr. 412). Dr. Gibbs found no evidence of myelopathy or radiculopathy on physical examination. (Id.). Dr. Gibbs prescribed Norco to control plaintiff's pain, and ordered an MRI of the thoracic spine. (Id.).

Plaintiff saw Dr. Gibbs on August 19, 2008, at which time plaintiff complained of low back pain and right groin fold pain, and thoracic and right-sided abdominal pain. (Tr. 407). Dr. Gibbs indicated that plaintiff's MRI revealed no evidence of reoccurrence of the mass, and no evidence of definite disc herniation. (Tr. 409). Dr. Gibbs noted that there were a couple of tiny protrusions in the midthoracic spine that did not deform the spinal cord or the exiting nerve roots. (Id.). Dr. Gibbs indicated that plaintiff may have developed a lumbar herniated disc or some other condition in the lumbar spine. (Id.). Dr. Gibbs recommended a repeat MRI scan of the lumbar spine. (Id.).

Plaintiff saw Dr. Gibbs on September 30, 2008, at which time plaintiff continued to complain of low back pain and right groin pain. (Tr. 403). It was noted that plaintiff's affect was very flat and plaintiff was somewhat tearful at times throughout the examination. (Id.). Dr. Gibbs indicated that plaintiff's MRI scan revealed very mild facet arthropathy[24] at L4-5 and tiny disc

_____

[24]A degenerative disease of the facet joints. See Stedman's at 161.

- 19 -

protrusion centrally at L1-2.  (Id.).  Dr. Gibbs stated that the source of plaintiff's lumbosacral pain

and right groin pain was unclear to him.  (Id.).  Dr. Gibbs noted that plaintiff reported good relief

from the injections performed by Dr. Cleaver.  (Id.).  Dr. Gibbs recommended counseling for

plaintiff's depressed mood.  (Id.).  He also recommended a myelogram CT scan.  (Id.).

     Plaintiff presented to Kishore Khot, M.D., Staff Psychiatrist at Community Counseling

Center, on November 26, 2008.  (Tr. 456-57).  Plaintiff reported feeling sad about his back pain.

(Tr. 456).  Plaintiff also reported feeling anxious at times.  (Id.).  Plaintiff denied any suicidal or

homicidal ideations, or psychotic symptoms.  (Id.).  Plaintiff reported that he had made some

suicidal statements to "get attention for the pain."  (Id.).  Plaintiff was taking Amitriptyline and

Xanax, but had never seen a psychiatrist.  (Id.).  Upon mental status exam, Dr. Khot found that

plaintiff's affect and mood were depressed, plaintiff's thought processes were logical and

organized, and plaintiff had no suicidal or homicidal ideation.  (Tr. 457).  Dr. Khot diagnosed

plaintiff with major depression,[25] recurrent, severe; and generalized anxiety disorder;[26] with a GAF

score of 60.  (Tr. 457).

     Dr. Terry Cleaver administered steroid injections in November and December of 2008.

(Tr. 429-440).

     Plaintiff underwent EMG testing at Washington University School of Medicine

Department of Neurology on August 7, 2009, which revealed electrodiagnostic evidence of

---

     [25]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and
appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

     [26]A psychological disorder in which anxiety or morbid fear and dread accompanied by
autonomic changes are prominent features.  Stedman's at 569.

bilateral, worse on the left, L5 to S1 radiculopathy, with ongoing and chronic denervation.[27]  (Tr. 471).

Plaintiff underwent an MRI of the lumbar spine on September 2, 2009, which revealed mild degenerative changes of the cervical and lumbar spine and no central canal stenosis.  (Tr. 552).

On September 16, 2009, plaintiff underwent a myelogram and post-myelogram CT of the lumbar spine, which revealed moderate degenerative changes of the lumbar spine, and moderate to severe bilateral neural foraminal narrowing at L4-L5.  (Tr. 576).

In October 2009, plaintiff underwent an L5-S1 bilateral medial facetectomy[28] and foraminotomy[29] performed by Dr. Justin Brown at Washington University. (Tr. 622).

Plaintiff presented to Paul W. Rexroat, Ph.D., on October 14, 2009, for a psychological evaluation at the request of the state agency.  (Tr. 539-42).  Plaintiff complained of occasional mood swings, depression, irritability, fatigue, occasional passive suicidal ideation, and no suicide attempts.  (Tr. 540).  Plaintiff did not report anxiety as a problem.  (Id.).  Upon mental status examination, Dr. Rexroat found that plaintiff exhibited a mildly restricted range of emotional responsiveness and a slightly flat affect, but exhibited no symptoms of a thought disorder.  (Id.).  Dr. Rexroat stated that plaintiff described significant symptoms of major depression.  (Id.).  Dr. Rexroat found that plaintiff appeared to be functioning in the average range of intelligence.  (Tr. 541).  Dr. Rexroat stated that plaintiff was able to understand and remember simple instructions,

---

[27]Loss of nerve supply.  Stedman's at 509.

[28]Excision of a facet.  Stedman's at 691.

[29]Surgical enlargement of the foramen.  See Stedman's at 759.

sustain concentration and persistence with simple tasks, and interact socially and adapt to his environment.  (Id.).  Dr. Rexroat indicated that plaintiff had few limitations in his activities of daily living, noting that plaintiff did laundry, washed dishes, put wood in the heater, drove, cooked, and sometimes went shopping.  (Id.).  Dr. Rexroat found that plaintiff had few limitations in social functioning.  (Id.).  Dr. Rexroat noted that plaintiff exhibited good social skills, and visited with friends.  (Id.).  Dr. Rexroat found that plaintiff was able to sustain concentration, persistence, and pace with simple tasks, and that his memory functioning appeared to be in the average range.  (Id.).  Dr. Rexroat diagnosed plaintiff with major depression, recurrent, moderate; and assessed a GAF score of 55.  (Tr. 542).

Dr. Rexroat also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he found that plaintiff had no limitations in his ability to understand, remember, and carry out instructions.  (Tr. 543).  Dr. Rexroat expressed the opinion that plaintiff had moderate limitations in his ability to interact appropriately with the public, interact appropriately with supervisors and co-workers, and ability to respond appropriately to usual work situations and to changes in a routine work setting.  (Tr. 544).

Plaintiff presented to Chi-Tsai Tang, M.D. at Washington University Orthopedics on November 10, 2009.  (Tr. 622-25).  Plaintiff reported that his leg symptoms had improved since surgery.  (Tr. 622).  Plaintiff complained of aching in his buttocks and posterior back, which was worsened with sitting, standing, and walking.  (Id.).  Upon examination, plaintiff had a positive straight leg raising on the left; tenderness to palpation at the bilateral posterior superior iliac spine

- 22 -

regions, worse on the left than the right; positive Gaenslen's sign[30] on both sides; positive thigh

thrust maneuver for sacroiliac pain; leg length discrepancy with the right leg longer than the left

leg; pain in the posterior buttocks with end range flexion of the left hip and internal rotation in

flexion of the left hip; and limited range of motion of the hips.  (Tr. 624).  Dr. Tang's impression

was low back pain with radicular symptoms consistent with sacroiliac pain, which has responded

well to previous injections, manipulations and therapy.  (Id.).  Dr. Tang recommended that

plaintiff continue with physical therapy, and undergo sacroiliac injections.  (Tr. 624-25).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.      The claimant has not engaged in substantial gainful activity since September 7, 2007, the alleged onset date (20 CFR. 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: disorders of the back (discogenic and degenerative) and affective mood and anxiety disorders (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant, who is able to lift/carry and push/pull twenty pounds occasionally and ten pounds frequently, and who is able to stand/walk for two out of eight hours and sit for six out of eight hours for a total of eight out of eight hours, is limited to work that allows a sit/stand option; the claimant is able to occasionally perform the postural activities of climbing ramps and stairs, balancing, stooping, crouching, kneeling, and crawling; the claimant is

---

[30]Pain on hyperextension of the hip with pelvis fixed by flexion of opposite hip; causes a torsion stress at the sacroiliac and lumbosacral joints.  Stedman's at 1769.

not able to climb ladders, ropes, or scaffolds; the claimant is not able to tolerate
constant exposure to machinery, heights, or vibration; and the claimant is limited
to the performance of simple, repetitive tasks and instructions.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on December 24, 1962 and was 44 years old, which is
defined as a younger individual age 18-44, on the alleged disability onset date.
The claimant subsequently changed age category to a younger individual age 45-
49 (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in
English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability
because using the Medical-Vocational Rules as a framework supports a finding
that the claimant is "not disabled," whether or not the claimant has transferable
job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual
functional capacity, there are jobs that exist in significant numbers in the national
economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act,
from September 7, 2007, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-22).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits
filed on January 3, 2008, the claimant is not disabled under sections 216(I) and
223 (d) of the Social Security Act.

(Tr. 22).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  <u>See</u> 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  <u>Id.</u>  Age, education and work experience of a claimant are not considered in making the "severity" determination.  <u>See</u> <u>id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See</u> <u>id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See</u> <u>id.</u>  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

　　　The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

- 27 -

C.    <u>Plaintiff's Claims</u>

Plaintiff argues that the ALJ erred in determining plaintiff's physical and mental residual functional capacity.  Plaintiff also argues that, in determining plaintiff's physical RFC, the ALJ erred in assessing plaintiff's credibility.  Specifically, plaintiff contends that the ALJ ignored the more recent medical evidence in assessing plaintiff's credibility and determining his RFC.  Plaintiff also contends that the ALJ erred in determining plaintiff's mental RFC.  The undersigned will discuss plaintiff's claims in turn.

In determining plaintiff's RFC, the ALJ first performed a credibility analysis.  "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the <u>Polaski</u> factors."  <u>Kelley v. Callahan</u>, 133 F.3d 583, 588 (8th Cir. 1998).  <u>Polaski</u> requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  <u>Polaski</u>, 739 F.2d at 1322.  Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.  <u>Id.</u>  The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.  <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998).

- 28 -

The ALJ discussed plaintiff's daily activities.  (Tr. 19).  The ALJ stated that plaintiff is able to drive, do some laundry, do dishes, use a computer, visit with friends, and "tinker with lawnmowers."  (Id.).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

The ALJ also discussed plaintiff's work history.  (Tr. 12).  The ALJ noted that plaintiff's weak earnings history did not show strong motivation to work, although the ALJ acknowledged that this was only one factor he had considered in assessing plaintiff's credibility.  (Tr. 19).  A claimant's poor earnings history prior to his alleged disability onset date is a valid factor for the ALJ to consider in assessing the claimant's credibility.  See Fredrickson v. Barnhart, 359 F.3d 972, 976-77 (8th Cir. 2004).

The ALJ summarized the medical records regarding plaintiff's physical impairments, and concluded that the objective medical evidence did not support plaintiff's complaints.  (Tr. 16-19).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ found as follows with regard to the objective medical evidence:

[T]he claimant's history of seeking treatment, the inconsistency of the presentation of the claimant's complaints with the results of diagnostic testing and imaging and the clinical findings from examination and courses of treatment, the generally conservative treatment modalities following his surgeries, and the lack of frequent emergency room presentations or lengthy hospital admissions do not support the severity of the claimant's allegations.

(Tr. 18).  The ALJ continued:

> On this record, the claimant lacks the signs typically associated with chronic, severe musculoskeletal pain, such as muscle atrophy, persistent or frequently recurring muscle spasms, persistent neurological deficits (motor, sensory, or reflex loss), or other signs of severe nerve root impingement, positive straight leg raising, persistent inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction.  The medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis secondary to any musculoskeletal impairment.  Moreover, no doctor prescribed an ambulatory assistive device, at least not for extended periods of time.

(Id.).

The undersigned finds that the ALJ's determination that plaintiff's subjective complaints were unsupported by the objective medical evidence was not supported by substantial evidence. As plaintiff points out, the ALJ relied primarily on evidence from 2007 and 2008 to support his finding.  Plaintiff acknowledges that this early evidence was not supportive of plaintiff's allegations of disability.  The record reveals that plaintiff's back impairment gradually improved with conservative treatment following his second surgery in September 2007.  For example, on January 3, 2008, plaintiff reported that his lower extremity aching and fatigue symptoms had "all but resolved."  (Tr. 425).  Upon physical examination, plaintiff had a normal range of motion of the back, no focal tenderness to palpation, no evidence of spasm, and plaintiff's straight leg raising test was negative.  (Tr. 426).  Dr. Gibbs stated that plaintiff was doing much better regarding his back, and indicated that he would gradually advance plaintiff's activities to riding on his tractor and four-wheeler, and lifting.  (Tr. 428).  On February 7, 2008, plaintiff reported that his low back and lower extremity symptoms had completely resolved.  (Tr. 422).  Plaintiff indicated that he had increased endurance and function, and was not taking any pain medication. (Id.).  In April 2008, following the surgical removal of plaintiff's thoracic mass, plaintiff indicated that he was contemplating applying for a job as a custodian.  (Tr. 414).  Plaintiff reported that he

had spent three or four hours picking up limbs in his yard the previous day.  (Id.).  In sum, the medical evidence from 2007 and the first half of 2008 is not supportive of plaintiff's allegations of disability.  As such, the ALJ's finding is supported by substantial evidence as to this period.

In August 2008, plaintiff reported a very sharp, severe, radiating pain in his lower back, and right groin pain that started after he drove a tractor.  (Tr. 411).  Dr. Gibbs prescribed Norco to control plaintiff's pain, and recommended further testing.  (Tr. 412).  Plaintiff continued to complain of low back pain and right groin pain, and was treated with Norco and steroid injections.  (Tr. 403-06, 429-440).  Plaintiff underwent EMG testing in August 2009, which revealed evidence of bilateral, worse on the left, L5 to S1 radiculopathy, with ongoing and chronic denervation.  (Tr. 471).  Plaintiff underwent a myelogram and post-myelogram CT scan of the lumbar spine in September 2009, which revealed moderate degenerative changes of the lumbar spine, and moderate to severe bilateral neural foraminal narrowing at L4-L5.  (Tr. 576). In October 2009, plaintiff underwent a fourth back surgery in October 2009.  (Tr. 622).  In November 2009, plaintiff reported to Dr. Tang that, although his leg symptoms improved following surgery, he still experienced pain in his buttocks and posterior back.  (Tr. 622).  Upon examination, Dr. Tang noted many positive findings, including a positive straight leg raising test on the left; tenderness to palpation; positive Gaenslen's test on both sides; positive thigh thrust maneuver for sacroiliac pain; and limited range of motion of the hips.  (Tr. 624).  Dr. Tang diagnosed plaintiff with back pain with radicular symptoms consistent with sacroiliac pain.  (Id.). This objective evidence is supportive of plaintiff's subjective allegations of disabling pain.  As such, the ALJ erred in discrediting plaintiff's allegations based on the purported lack of support by the medical evidence.

After the ALJ assessed plaintiff's credibility, he made the following determination

regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant, who is able to lift/carry and push/pull  twenty pounds occasionally and ten pounds frequently, and who is able to stand/walk for two out of eight hours and sit for six out of eight hours for a total of eight out of eight hours, is limited to work that allows a sit/stand option; the claimant is able to occasionally perform the postural activities of climbing ramps and stairs, balancing, stooping, crouching, kneeling, and crawling; the claimant is not able to climb ladders, ropes, or scaffolds; the claimant is not able to tolerate constant exposure to machinery, heights, or vibration; and the claimant is limited to the performance of simple, repetitive tasks and instructions.

(Tr. 15).

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence,

including medical records, observations of treating physicians and others, and the claimant's own

description of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)

(quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). A claimant's RFC is what he or

she can do despite his or her limitations. 20 C.F.R. § 404.1545. It is the claimant's burden, and

not the Social Security Commissioner's burden to prove the claimant's RFC. Pearsall, 274 F.3d

at 1218. Determination of residual functional capacity is a medical question and at least "some

medical evidence 'must support the determination of the claimant's [residual functional capacity]

and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the

workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001)).

The undersigned finds that the ALJ's physical residual functional capacity determination is

not supported by substantial evidence. In support of his determination, the ALJ stated that none

of plaintiff's physicians has imposed any limitations on plaintiff's ability to work.  None of

plaintiff's treating physicians, however, ever expressed an opinion regarding plaintiff's functional

limitations.  "A treating doctor's silence on the claimant's work capacity does not constitute

substantial evidence supporting [an] ALJ's functional capacity determination when the doctor was

not asked to express an opinion on the matter and did not do so, particularly when that doctor did

not discharge the claimant from treatment."  Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir.

2009).

      As discussed above, the medical evidence reveals that plaintiff began complaining of

severe back pain in August of 2008, and significant objective findings were noted beginning in

August of 2009 through the date of the hearing.  Plaintiff repeatedly complained of severe and

disabling pain, was consistently prescribed narcotic pain medication, underwent steroid injections,

and underwent a fourth back surgery.  In August of 2009, EMG testing revealed L5 to S1

radiculopathy, with ongoing and chronic denervation.  (Tr. 471).  A myelogram and post-

myelogram CT scan of the lumbar spine revealed moderate degenerative changes of the lumbar

spine, and moderate to severe bilateral neural foraminal narrowing at L4-L5.  (Tr. 576).  Finally,

Dr. Tang noted significant positive findings upon examination in November 2009, including

positive straight leg raising on the left.  (Tr. 624).  These objective findings reveal that plaintiff

suffers from a severe back impairment that would be expected to cause significant, and possibly

disabling, pain.

      There is no opinion from any physician, treating or consulting, regarding plaintiff's ability

to function in the workplace with his impairments.  As such, there is no medical evidence in the

record suggesting that plaintiff can, or cannot, perform a range of sedentary work.  The residual

functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's RFC assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

The undersigned finds that the ALJ also erred in determining plaintiff's mental RFC. The ALJ found that plaintiff was limited to the performance of simple, repetitive tasks and instructions. (Tr. 15). Plaintiff saw Dr. Rexroat on October 14, 2009, at the request of the state agency. (Tr. 539-42). Dr. Rexroat noted that plaintiff described significant symptoms of major depression. (Tr. 540). Dr. Rexroat diagnosed plaintiff with major depression, recurrent, moderate; and assessed a GAF score of 55. (Tr. 542). Dr. Rexroat expressed the opinion that plaintiff had moderate limitations in his ability to interact appropriately with the public, interact appropriately with supervisors and co-workers, and ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 544). The ALJ did not incorporate these limitations in his RFC, and provided no explanation for his failure to do so. Dr. Rexroat was the only examining mental health professional who provided an opinion regarding plaintiff's mental limitations. As such, the mental RFC formulated by the ALJ is not supported by substantial evidence.

## **Conclusion**

In sum, the ALJ erred in relying on medical evidence from 2007 and 2008 in finding that plaintiff's subjective complaints of pain were not supported by the objective medical evidence.  The ALJ then formulated an RFC that was not supported by substantial evidence.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly consider the medical evidence from 2009; obtain additional medical evidence addressing plaintiff's ability to function on the workplace; indicate the weight he is assigning to the opinion of examining psychologist Dr. Rexroat; formulate a new residual functional capacity for plaintiff based on the medical evidence in the record; and then to continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this   6th   day of September, 2012

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE